THOMAS J. COLBERT, executor, *vs.* PATRICK J. HENNESSEY & others[1]

(and a companion case[2]).

Middlesex.    January 5, 6, 1966. — June 15, 1966.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & REARDON, JJ

*Corporation,* Transfer of stock, Stockholder, Voting trust. *Executor and Administrator,* Stock of decedent, Removal. *Waiver. Pledge. Probate Court,* Appeal, Findings by judge, Judicial discretion, Removal of fiduciary.

Upon appeal from the final decree in a proceeding in a Probate Court, all questions of law, fact, and discretion are open in this court. [134]

Upon appeal from the final decree in a proceeding in a Probate Court, with a report of the evidence but without a report of material facts, the entry of the decree imports findings of all facts necessary to sustain it within the scope of the pleadings and supported by the evidence, and such findings on oral testimony will not be disturbed unless plainly wrong, but this court is in the same position as the judge with respect to depositions and exhibits. [134]

An agreement among stockholders of a close corporation designed to achieve voting control of it, providing that no party thereto or his personal representative would transfer or sell his stock without the consent

---

[1] Elias M. Loew, Mary E. O'Neill, Thomas J. Parle, Frances Sawyer, Grace Brady, John Tubbs, Nora Oulten, Julius L. Shack; Charles M. Goldman, Elias M. Loew, Thomas J. Colbert, Elias F. Shamon, as they are voting trustees under an agreement with Paul F. Bowser and others; Bay State Harness Horse Racing and Breeding Association, Inc. and Norfolk County Concessionaires, Inc.

[2] Elias M. Loew *vs.* Thomas J. Colbert, executor.

of the other parties, was valid, and upon the death of one of the parties, his executor was properly directed, by a Probate Court decree upon a petition for instructions, to dispose of the testator's shares "subject to" the agreement. [138–140]

A restriction in the articles of organization and by-laws of a close corporation, that any stockholder who desired to sell or transfer his stock must first offer it to the corporation, was valid, and applied to certificates of a voting trust in which all the stock of the corporation was placed and which was created by an agreement expressly imposing on the certificates the same restrictions on sale and transfer as were imposed on the stock; it was without significance that the articles of organization and by-laws did not make the restriction specifically applicable to voting trust certificates. [140–141]

Upon a petition for instructions by an executor as to the disposal of stock of the estate in a close corporation whose articles of organization and by-laws required that the stock be first offered to it, a contention by another stockholder that the corporation could not afford to buy the stock was irrelevant on the record. [141]

Participation by a principal stockholder of a close corporation in an agreement with other stockholders of the corporation designed to achieve voting control of it, providing that no party thereto would transfer or sell his stock without the consent of the other parties, was a relinquishment by the principal stockholder of the benefit of a previous vote by the corporation, applicable to his stock but not that of such other stockholders, to "suspend" the operation of a restriction in its articles of organization and by-laws prohibiting the sale or transfer of its stock without an offer thereof being first made to it. [141–142]

Delivery of voting trust certificates representing shares of stock in a close corporation to a lender of money to it pursuant to the terms of the loan agreement created a valid equitable pledge of the certificates, even though the certificates did not recite that a stock power had been indorsed by the pledgor. [142]

Upon an appeal from a final decree of a Probate Court dismissing a petition for the removal of the respondent as executor of a decedent's estate on the alleged ground of unsuitability by reason of conflict of interest between his duties as executor and his duties as the president and a director of a close corporation, stock in which comprised a substantial part of the estate and the articles of organization and by-laws of which gave the corporation a "first option" to buy the stock of any stockholder, where it appeared that when the decedent named the respondent as executor in his will he knew the respondent as a director and officer of the corporation, as a friend and counselor of two other stockholders, and as an attorney with whom he had long been associated and to whom he may have owed substantial fees, this court in the circumstances could not say that the trial judge was plainly wrong in not removing the respondent. [144–145]

There was on the record no ground for disturbing a decree of a Probate Court dismissing a petition to remove the executor of a will on the alleged ground of unsuitability of the executor by reason of hostility to

the petitioner, who was a pledgee of a substantial amount of stock of a close corporation owned by the estate and was also himself a stockholder in that corporation and an assignee of the residuary interests in the estate, where it appeared that the allegedly hostile acts of the executor were permissible for him to do in the performance of his primary duty to the estate. [145–146]

The facts, that an attorney, who rendered many important services to a client during a fourteen year period preceding his death and who became executor of his client's estate, filed a petition under G. L. c. 197, § 6, for arbitration of his claim against the estate for such services after making a payment to himself from the estate on account, did not show that he was unsuitable to continue in office, and a decree of a Probate Court dismissing a petition for his removal was affirmed. [146–147]

PETITION for instructions filed in the Probate Court for the county of Middlesex on April 17, 1963.

The case was heard by *Leggat, J.*

PETITION for removal of an executor filed in the same court on May 13, 1963.

The case was heard by *Sullivan, J.*

*Calvin P. Bartlett* stated the case in the proceeding for instructions.

*Calvin P. Bartlett (Henry S. Healy* with him) for Thomas J. Colbert, executor, respondent in the petition for removal.

*Harold B. Dondis (Oliver S. Sughrue, Jr.,* with him) for Patrick J. Hennessey.

*Gerald Gillerman (Charles M. Goldman & John M. Reed* with him) for Elias M. Loew.

*Edward R. Bonitz,* for Mary E. O'Neill, joined in a brief.

KIRK, J. The issues later to be stated and considered in the two cases arise from decrees entered in the Middlesex Probate Court in the course of litigation concerning the estate of Paul F. Bowser. The cases were heard and decided by different judges. Thomas J. Colbert is executor under the will of Bowser. In case No. 6716, which was heard and decided first, Patrick J. Hennessey and Elias M. Loew appeal from the decree entered by the judge on Colbert's petition for instructions. In case No. 6715, Loew appeals from a decree dismissing his petition for the removal of Thomas J. Colbert as executor.

In both cases the evidence is reported. In neither case did the judge make a report of material facts. No request was made by any party under G. L. c. 215, § 11, that the judge report the facts found by him. The evidence in both cases consists of a mass of documents and voluminous transcripts of testimony, much of it conflicting. On this state of the record, we apply to a probate case the same standard of review we apply to an appeal in equity. *Wright* v. *Wright,* 13 Allen, 207, 209. *Swift* v. *Hiscock,* 344 Mass. 691, 693–694. *Adoption of a Minor,* 345 Mass. 663, 669. All questions of law and fact, including those of discretion, are open for our determination. *Long* v. *George,* 296 Mass. 574, 579. *Lowell Bar Assn.* v. *Loeb,* 315 Mass. 176, 178. *Jones* v. *Jones,* 349 Mass. 259, 262. In proceeding to a determination we are mindful of the guideposts established in our decisions. The entry of the decree may be said necessarily to import "a finding of every fact essential to sustain it within the scope of the pleadings and supported by the evidence," and we may not "reverse the findings of the judge, express or implied, unless we are satisfied that they are plainly wrong." *McMahon* v. *Monarch Life Ins. Co.* 345 Mass. 261, 262–263, and cases cited. Also, because the evidence is both documentary and oral, we are in the position described in *Murphy* v. *Hanlon,* 322 Mass. 683, 685: "In so far as the evidence consists of depositions and exhibits we are in the same position to judge its weight as was the trial judge, but in so far as it consists of testimony which he heard orally he had the advantage of observing the witnesses in person. We can therefore reverse his findings only if we are satisfied that, giving to the oral testimony all the weight the judge could justifiably give to it, the findings are nevertheless plainly wrong."

Although the relief sought in the two cases is markedly different and although the issues of law raised by them are separate and distinct, they have much in common by way of background, participants and evidence. In so far as relevant to our consideration of both cases, we set out the substance of the documents, the undisputed evidence which may

be treated as fact, and, where disputed, the evidence which, in contemplation of the decrees, the judge must have believed. In order to avoid repetition we deal with the two cases in a single opinion.

Bowser died on July 17, 1960. Colbert began his duties as executor the following month. Although some of Bowser's debts have been paid from the estate, a variety of events contributed to delay the final distribution of the estate. A large part of the estate consists of stock in the Bay State Harness Horse Racing and Breeding Association, Inc. (Bay State), which runs a racetrack in Foxboro, and in Norfolk County Concessionaires, Inc. (Norfolk), a corporation supplying food and drink at the track. The stock[3] was left by the residuary clause of the will to ten of Bowser's nieces and nephews.

Before his death, Bowser had been a director and president of Bay State. (Colbert succeeded him in both positions in August, 1960.) Bowser had initiated the formation of the corporation in 1946 with others, including Hennessey, the late James J. O'Neill, whose widow is a party to the litigation, and Colbert who thereafter, until Bowser's death, acted as counsel to Bay State and as Bowser's personal counsel. In 1947, Bay State, through Bowser, approached Loew for a loan. Loew advanced more than $600,000 to Bay State in two transactions, thereby supplying the corporation with enough funds to complete construction of the track. Loew received as security for the loans two mortgages on the track property, notes from Bay State indorsed individually by Bowser, an outright transfer of about twenty-five per cent of the Bay State and Norfolk stock to Loew, and a pledge of all of Bowser's stock (now thirty-five per cent of the total number of shares in Bay State). A voting trust agreement due to expire in July, 1967, affecting all the Bay State and Norfolk stock was also part of the loan transaction.

---

[3] Hereafter the word "stock" will refer only to Bay State stock, since neither the pleadings nor the decrees nor the arguments in either case deal with the disposition of or Colbert's handling of the Norfolk stock.

The articles of organization and by-laws of Bay State required any stockholder, including his heirs, assigns, executors, or administrators, who desired to sell or transfer his stock, to offer it first to the corporation by written notice to the directors stating the selling price and nominating an arbitrator. If the directors did not, within thirty days, accept the offer of the stockholder or the price fixed by the arbitrators, the holder was free to sell as he wished.

Under the voting trust agreement, all shares of stock in Bay State were deposited with the voting trustees. Voting trust certificates were issued to the depositing stockholders. The voting trustees were required to elect four directors nominated by Loew and four nominated by Bowser and Colbert.

In 1958, Bowser made an agreement, unknown to Loew, with two minority Bay State stockholders, Hennessey and Mrs. O'Neill. This tripartite agreement, which provided that no one of the parties or their heirs, executors, administrators or assigns would transfer or sell his stock without the consent of the others, was designed to achieve for its participants voting control of Bay State, subject to the voting trust agreement. Colbert acted as counsel for Bowser and Mrs. O'Neill in the making of the tripartite agreement.

After Bowser's death, his ten residuary legatees were informed of the terms of the will. They gave some indication that they wished to retain the stock, even if they might have to advance funds to pay some of the debts of the estate, taxes, or specific legacies in the will which the liquid assets of the estate, exclusive of the stock, could not then satisfy.

The evidence shows that Colbert, with reasonable promptness, undertook to settle the estate. This involved the sale of the extensive real estate holdings and of the personal property, such as horses and jewelry, belonging to Bowser. In August, 1961, Colbert drew a check for $6,000 against the estate for legal services rendered to Bowser for the six years prior to his death. Colbert conferred with counsel

for the residuary legatees over a period of two years about the fate of the stock. Finally, on July 23, 1962, while the stock remained unsold, the legatees assigned their entire residuary interest in the estate to Loew. Loew thereupon demanded of Colbert that he be kept informed of all aspects of the administration of the estate, that Colbert pay out no money for any purpose, including taxes, and that Colbert resign as executor. Colbert did not resign, and, through counsel, advised Loew that the administration of the estate was within his charge under the supervision of the court.

Early in 1963, Colbert filed a petition under G. L. c. 197, § 6, for arbitration of his claim against the estate for legal services to Bowser from 1947 to 1960. In April, 1963, Colbert brought the petition for instructions. The decree on the petition was entered May 28, 1964. Loew and Hennessey have appealed.

### THE PETITION FOR INSTRUCTIONS.

In his petition for instructions Colbert sought guidance from the Probate Court regarding the course of action he should follow in attempting to dispose of Bay State stock, represented by voting trust certificates, standing in Bowser's name, but in the physical possession of Loew under the terms of the 1947 loan agreement. He also sought instructions as to what extent, if at all, he was obliged to permit Loew to participate in the administration of the estate.

Specifically placed in issue were: (1) the validity of the 1958 tripartite agreement among Bowser, Hennessey and Mrs. O'Neill, and (2) the validity of the first option provision in the articles of incorporation and by-laws of Bay State, as applied to the voting trust certificates.

The decree provided that Colbert, "as executor, is obliged, as soon as reasonably possible and feasible, to dispose of said shares of stock for the best interests of said estate, subject to the three party agreement and any restrictions of said Corporation now applicable and capable of being performed; and that the entire administration of

said estate as to payments of charges of administration, taxes, debts and legacies is the sole duty, responsibility and obligation of said executor, subject only to review and final approval of said Court.''

The pledge which was part of the 1947 loan agreement is not mentioned in the decree. It was adverted to in the petition but its validity was not placed directly in issue. Hennessey does not refer to it in his answer. Loew and Shack[4] assert its validity in their answers. The issue became important at the trial. The parties have argued it in their briefs. Since it is doubtful that the estate can be settled if the issue is not determined, we think it is our duty to resolve it. We do so in light of our broad scope of review which embraces all questions of fact, law and discretion raised by the evidence. See *Long* v. *George,* 296 Mass. 574, 579; *Sulmonetti* v. *Hayes,* 347 Mass. 390, 391–392.

We state briefly the positions taken by Loew and Hennessey, respectively, concerning the matters in dispute. It is first to be observed that, although Loew's standing in the case derives from the assignment to him of the interests of the ten residuary legatees, he is also the owner in his own right of about twenty-five per cent of the Bay State stock transferred to him when the loan to Bay State was made in 1947 as well as alleged pledgee of the Bowser stock. Loew contends that the tripartite agreement is invalid, that the corporate restrictions on the sale and transfer of stock are valid, and that the 1947 pledge of stock to him is valid. Hennessey, on the other hand, contends that the tripartite agreement to which he was a party is valid, that the requirement that the sale of the estate stock be subject to Bay State's option to purchase is invalid, and that the pledge of stock to Loew is invalid.

1. We find no error in the determination that the tripartite agreement was valid. Whatever may be the rule elsewhere (see *Tracey* v. *Franklin,* 31 Del. Ch. 477), ''[r]estrictions on the sale of shares of stock in a corporation are

[4] Shack is the holder and payee of a note and mortgage on the same terms as Loew.

valid and binding in this Commonwealth," and cannot "be declared void unless palpably unreasonable." *Brown* v. *Little, Brown & Co.* (*Inc.*) 269 Mass. 102, 110. This "modern liberal attitude" (2 O'Neal, Close Corporations, p. 9, fn. 18), anticipated by Holmes, C.J., in a dictum that "there seems to be no greater objection to retaining the right of choosing one's associates in a corporation than in a firm," *Barrett* v. *King,* 181 Mass. 476, 479, should be applied to give effect to agreements among stockholders in a close corporation just as effect is given to provisions for corporate consent or first options in articles of association or by-laws. See *Longyear* v. *Hardman,* 219 Mass. 405; *68 Beacon St. Inc.* v. *Sohier,* 289 Mass. 354. The agreement was a means of securing corporate control of Bay State to those whose enterprise sponsored it and who contributed to the daily operation of the business. This was not a "palpably unreasonable" purpose. The agreement was valid.

There is a further reason for not interfering with the operation of the tripartite agreement. Since shares of the three holders constitute about fifty-five per cent of the Bay State stock, their sale as a block would insure to the buyer voting control of the corporation and would obviously command a higher price than the total which would be received if each party sold his shares separately. It is therefore to the advantage of the estate to sell the Bowser stock pursuant to the agreement with Hennessey and O'Neill. Whatever augments the value of the estate enhances the value of the residue. The only objection to the block sale comes from Loew. It is clear that Loew's objection springs, not from his standing as assignee of the residue, but from the fact that he is a stockholder who, by adding the Bowser stock alone to his present holdings, would achieve voting control of the corporation. Loew's private interest as a shareholder, however, should not be permitted to thwart a sale which is advantageous to the estate. This is especially true where his private interest is in conflict with his standing in the case as assignee of the residuary interest. In that standing he cannot play the role of a

minority stockholder of Bay State. Since the surviving
parties to the agreement and Colbert have affirmed their
willingness to abide by its terms, and since no public policy
is offended by its operation, we think that the estate stock
should be sold, as agreed, with the Hennessey and O'Neill
shares. The judge was right in instructing the executor to
do so.

2. Hennessey's contention that the stock, represented by
the voting trust certificates, need not be first offered to the
corporation as provided in the by-laws and in the voting
trust agreement raises three points: (a) whether a corpo-
ration may purchase certificates in a voting trust which con-
trols the corporation; (b) whether, assuming the validity
of the first option provision in the by-laws, Bay State is
financially able to make the purchase; and (c) whether a
corporate waiver, later to be mentioned, of the first option
provision on "original" transfers of Bowser's stock may
extend to and embrace Hennessey's and O'Neill's stock
when joined with Bowser's for the purpose of a sale pur-
suant to the tripartite agreement. We deal with each point.

(a) As already noted, corporate restrictions on the sale
or transfer of stock are generally honored. *Monotype
Composition Co. Inc.* v. *Kiernan,* 319 Mass. 456, 458–459.
Although an executor's title to stock in an estate is acquired
by operation of law, further transfer of the stock either to
the specific legatees of the stock or to others is subject to
transfer restrictions. *Boston Safe Deposit & Trust Co.
v. North Attleborough Chapter of the Am. Red Cross,*
330 Mass. 114, 116–117. Hennessey argues that the voting
trust certificates of Bay State are on a different footing.
He says that the absence of a provision in the corporate
by-laws making the restriction on transfers as specifically
applicable to voting trust certificates as it is to shares of
stock means that there is no restriction on the transfer of
the voting trust certificates. The argument is untenable on
the factual situation here presented. All the Bay State
stock is in the voting trust created by an agreement which
expressly imposed on the voting trust certificates the same

restrictions on transfer imposed on the common stock by the articles of organization and by-laws. The certificate holders of this close corporation thus have agreed to be bound by the restrictions. In these circumstances, it seems to us that the corporate purchase of voting trust certificates, as allowed, for example, in *Martin* v. *Graybar Elec. Co. Inc.* 285 F. 2d 619 (7th Cir.), does not contravene the principle underlying *Sagalyn* v. *Meekins, Packard & Wheat Inc.* 290 Mass. 434, 440, which prohibited the use of corporate funds for the noncorporate purpose of establishing a voting trust designed to perpetuate in office an incumbent management. The case before us is different. Here the purpose of the corporate first option restriction, whether applied to voting trust certificates or to stock certificates, is the same, namely, to control entry into the corporation by outsiders. The same restrictions, therefore, that the by-laws and articles of association expressly attach to stock certificates apply also to voting trust certificates, as, indeed, is indicated on the face of the voting trust certificates. There was no error in the judge's ruling that the restrictions are valid.

(b) Hennessey contends that, if the restrictions are valid, it would be futile to offer the block of shares to the corporation because it cannot afford to buy the stock. The objection is irrelevant, considering the nature of this proceeding. We are reviewing a petition for instructions, and need not speculate on what might develop in a minority stockholder's suit. Bay State has not yet been offered the stock, and the decision to buy, if it is made, should be in the directors' sound discretion. *Barrett* v. *W. A. Webster Lumber Co.* 275 Mass. 302, 307–308. Since Bay State has not been determined to be insolvent, it would be premature to forbid the performance of the first option restriction on that basis. Accordingly, Hennessey's argument of financial incapacity fails.

(c) The final question dealing with the corporate restriction on transfers relates to an alleged waiver of the restriction with respect to Bowser. On July 16, 1947, Bay State voted "To suspend the operation of the restrictions on

Colbert *v.* Hennessey.

the transfer of stock of the Corporation to permit any
original transfer made by Paul F. Bowser . . . and the
original transfer . . . of any voting trust certificate rep-
resenting or issued in exchange for the Common Stock of
the Corporation."

Without pausing to analyze the meaning of the separate
terms of this vote, we think that the subsequent tripartite
agreement by which Bowser tied the sale of his stock to that
of Hennessey and Mrs. O'Neill was a relinquishment by him
of his rights under the waiver. The waiver was never ex-
pressly extended to the Hennessey and O'Neill shares. Nor
can it reasonably be said that the waiver granted to Bowser
was intended to attach to or encompass the stock of what-
ever other shareholders he chose to join in a block sale. If
we were to hold that the 1947 waiver was still effective and
applicable only to the Bowser stock, the purpose of the tri-
partite agreement of 1958 would be nullified.

3. Finally, we consider the pledge. The voting trust
certificates are in Loew's hands, clearly pursuant to the
terms of the initial loan agreement of 1947. In light of the
language used in that agreement and in other documents
over the years in which the stock is referred to as having
been pledged, it is clear that the delivery was intended to
represent a pledge of the certificates to Loew, the trans-
feree. Although the certificates recited no stock power in-
dorsement, we think that the delivery alone created an
equitable pledge. *Whitney* v. *Nolan,* 296 Mass. 419, 425.
See *Johnson* v. *Johnson,* 300 Mass. 24, 29. Consequently,
the executor should be instructed that the pledge is valid.

On the basis of the foregoing, the decree is to be modified
to specify that the first option restriction is valid and that
the pledge is valid and that Colbert, as executor, must ob-
serve the obligations imposed by each, and as so modified is
affirmed. Costs of appeal are in the discretion of the Pro-
bate Court.

*So ordered.*

THE PETITION FOR THE REMOVAL OF THE EXECUTOR.

In case No. 6715, Loew appeals from a decree dismissing his petition to remove Colbert as executor under the will of Paul F. Bowser.[5] The same standard of review applies here as applied to the petition for instructions with the qualification that since the issue before us — the removal of an executor — is within the judge's "wide discretion," *Quincy Trust Co.* v. *Taylor,* 317 Mass. 195, 196, we must give appropriate weight to his exercise of that discretion. *Osborne* v. *Craig,* 251 Mass. 169, 172. *Long* v. *George,* 296 Mass. 574, 579. *Wasserman* v. *Locatelli,* 343 Mass. 82, 83. *Cooney* v. *Montana,* 347 Mass. 29, 32.

Although the petition mainly alleged that Colbert was unwarrantably dilatory in the settlement of the estate, Loew's counsel, at the opening of the trial, stated that his principal contention was that Colbert's dual roles as director and president of Bay State on the one hand, and as executor under the will on the other hand, created a conflict of duties which rendered Colbert unsuitable to continue as executor. The alleged conflict stemmed from Colbert's obligation as executor to seek from the corporation the highest possible price for the stock if it were offered to the corporation, and his obligation to Bay State, as a director and president, to seek the lowest possible price. He would, it is argued, be trading with himself.

In addition to the stated ground of unsuitability, Loew introduced other evidence which he contends shows personal hostility to Loew by Colbert and makes him unsuitable to continue as executor. It is of interest to note that the hearing on the petition to remove Colbert commenced on July 27, 1964, less than two months after the date of the entry of the decree, May 28, 1964, on the petition for instructions, and to note further that the evidence which allegedly shows hostility to Loew was in large part elicited during the trial on

---

[5] Loew's appeal from the denial of his motion to reopen the hearing on the petition, not having been argued, is not considered. Rule 13 of the Rules for the Regulation of Practice before the Full Court, 345 Mass. 787.

the petition for instructions. Finally, it is not without significance that the judge who heard the petition for instructions expressly decreed that Colbert had the sole responsibility for the entire administration of the estate. See *Gordon* v. *Gordon,* 332 Mass. 210, 213.

Hostility toward Loew, it is contended, is shown by: (1) Colbert's adherence to the tripartite agreement, of which he was the architect in 1958, and which would deprive Loew of the opportunity to buy Bowser's stock separately at a lower figure. (2) The exclusion of Loew from conferences held by the parties to the tripartite agreement. (3) Colbert's testimony at the hearing on the petition for instructions that he no longer believed that the pledge of the voting trust certificates was valid. (4) The filing by Colbert, after Loew had obtained the assignment from the legatees, of a petition under G. L. c. 197, § 6, for the arbitration of Colbert's claim for legal services to Bowser for the years 1947–1960. (5) The appointment of Hennessey as one of the three appraisers of the estate.

We note generally that the stated grounds of Colbert's unsuitability relate not to misconduct or bad character but to the alleged "existence of . . . [interests] in conflict with his duty, or a mental attitude toward his duty or toward some person interested in the estate that creates reasonable doubt whether the executor . . . will act honorably, intelligently, efficiently, promptly, fairly and dispassionately in his trust." *Quincy Trust Co.* v. *Taylor,* 317 Mass. 195, 197. An executor may be deemed unsuitable when he has a personal interest which is of such a nature as to conflict with, and to prevent him from doing, his duty to the estate. *Putney* v. *Fletcher,* 148 Mass. 247, 248. Of the several roles which Colbert has in the situation, the only one which is strictly personal is as a creditor of the estate for legal services. We lay this aside for the moment to consider whether Loew's main contention of conflict of interest as executor and as director and president of Bay State raises such doubt of Colbert's fitness as to require us to say that the judge was plainly wrong in not removing him. When

Colbert was named as executor, he was known to Bowser as a director and officer of Bay State, as a friend and counselor of Hennessey and Mrs. O'Neill, and as an attorney with whom he had long been associated and to whom he may have owed substantial fees. The case is to be distinguished from those in which the executor used his position to gain office in or control of a corporation whose stock formed part of the estate. See *Matter of Hirsch,* 116 App. Div. (N. Y.) 367, affd. 188 N. Y. 584; *Matter of Grossman,* 157 Misc. (N. Y.) 164, affd. 250 App. Div. (N. Y.) 503; *Kellberg's Estate,* 86 Pa. 129. Rather, Bowser knew and obviously trusted Colbert, and was aware of his involvement in each phase of the operation of Bay State. These, in fact, may well have been among the reasons which prompted Bowser to name him. We are unable to say that a potential conflict, between Colbert in his role as executor and in his role as director and officer of Bay State, upon the offering of the stock for sale to the corporation, is enough to make him an unsuitable executor. Ideally, Colbert's object in both roles should be the ascertainment of the fair market value of the stock. His duties to the estate and to the corporation are therefore not incompatible but correlative.

We turn now to the other grounds. The judge was not plainy wrong in his implied finding that Colbert's removal was not required because of his supposed hostility to Loew. That which Loew assigns as springing from hostility was in fact, viewed objectively, permissible for Colbert to do or was done in the performance of his primary duty to the estate. 1. The tripartite agreement, previously discussed, if valid, was an asset of the estate. It was Colbert's duty to adhere to it, pending determination of its validity, rather than submit to Loew's demands that he renounce it. 2. Loew had no right, either as assignee of the residuary interests or as pledgee, to attend the conferences on the tripartite agreement. He was not a party to it, unlike Colbert, who was legally Bowser's sole successor as a party to the agreement. 3. Colbert's testimony at the hearing

on the petition for instructions that Bowser's pledge of the voting trust certificates was invalid, whether correct in law or not, could have been based, as the judge may have inferred it was based, on new evidence presented at that trial, and not, as Loew contends, on personal hostility to him. 4. Colbert's petition for compensation under G. L. c. 197, § 6, in itself, or in its timing or in the amount sought, does not require a finding of conflicting interest or hostility to warrant removal. The "manifest purpose" of G. L. c. 197, § 6, allowing an executor to obtain arbitration of his personal claims against an estate, is the protection of the beneficiaries against the executor's abuse of his office to gain material advantage. *Jose* v. *Lyman,* 316 Mass. 271, 281. If the beneficiaries who would be affected by the allowance of a claim under G. L. c. 197, § 6, had no opportunity to contest the claim because they were not notified, then the executor's failure to notify might manifest his unsuitability for his trust. See *Scott* v. *Rand,* 118 Mass. 215, 218; *Jose* v. *Lyman,* 316 Mass. 271, 281–282. Here, the testimony was conflicting on the time and nature of Colbert's disclosure of his § 6 claim. The judge evidently believed the testimony that the legatees and Loew knew of Colbert's claim and his plan to have it arbitrated. There is no showing that interested parties, including Loew, were not informed when the § 6 petition was filed or that they did not have an opportunity to be heard. The mere filing of the petition under G. L. c. 197, § 6, cannot be said to be evidence of unsuitability. The sense of the statute is that suitable executors may seek to have their claims arbitrated.

Nor did the fact that Colbert, as executor, had drawn a $6,000 check payable to himself for legal services to Bowser for six years prior to his death indicate bad faith on Colbert's part in also seeking a § 6 arbitration. The judge evidently believed Colbert's testimony that the $6,000 was "on account." The delay in filing the petition and the absence of the claim from a list of claims prepared by Colbert early in his administration could be found to have been due, as Colbert testified, to his difficulty in computing

Colbert *v.* Hennessey.

charges for a large number of services to Bowser over a period of fourteen years. This view of the evidence is at least as tenable as that the delay in filing the § 6 petition arose from hostility to Loew. In any event, since the legitimacy of the claim and its amount are for the Probate Court to decide, the size of the debt to be established is irrelevant to the issue of suitability. If the claim is established, an executor should be in no worse position than any other creditor of the estate. Whether great or small, the existence of a valid, established debt to an executor should not be cause to remove the executor, especially where, as here, the evidence shows that the testator probably knew of the debt.

Giving the evidence all the weight it may justifiably bear in supporting the judge's decision, *Murphy* v. *Hanlon,* 322 Mass. 683, 685, it does not appear to us that this is a case in which "the testator would not have wanted . . . [the executor] to continue," as in *Gordon* v. *Gordon,* 332 Mass. 210, 212. Indeed, the resulting complexity of appointing Colbert as executor may be "one of which the testator was not unaware and it can be said that he contemplated it and created it." *Matter of Sherman,* 9 Misc. 2d (N. Y.) 731, 735, affd. 279 App. Div. (N. Y.) 981. For these reasons, and because of our inability to find that the judge clearly erred in dismissing the petition, we do not disturb his decision. *Grossman* v. *Grossman,* 343 Mass. 565, 566. The decree is affirmed with costs of appeal in the discretion of the Probate Court.

*So ordered.*