THE FIRST NATIONAL BANK OF BOSTON,[1] executor, *vs.*
MARY E. SULLIVAN, executrix, & others.
(and four companion cases).

Middlesex.    May 20, 1974. — July 24, 1974.

Present: HALE, C.J., GOODMAN, & GRANT, JJ.

*Corporation,* Transfer of shares. *Laches. Equity Jurisdiction,* Laches.
*Equity Pleading and Practice,* Judicial discretion. *Executor and
Administrator,* Equitable claim to property.

A vote by the directors of a corporation, in substance that, if a
certain court in which various persons were claiming to be the
equitable owners of shares in the corporation should finally deter-
mine that they were the owners of the shares, restrictions on
transfer of the shares requiring them to be offered first to the
corporation for purchase by it were "waived only to permit such
shares to be registered" in the names of such persons, constituted
an effective waiver upon such a determination by the designated
court. [457-460]

Restrictions on the transfer of corporate shares requiring them to be
offered first to the corporation for purchase by it are for the
benefit of the corporation. [459]

One seeking in equity to enforce an equitable title to specifically
identifiable property in the hands of the personal representative
of a decedent was not a "creditor" of the decedent's estate within
G. L. c. 197, §§ 13, 14, and was not subject to those sections.
[460-462]

In the circumstances, in equity proceedings involving equitable claims
to corporate securities under assignments from their owner of
record or purchases of the original assignees' interests, a contention
by one who, as pledgee had possession of the securities as collateral
security for an indebtedness, that the claimants were guilty of
laches in that they did not assert their claims during the twelve or
thirteen years between the times of the original assignments and
the death of the original assignor and for about a year after his
death, was without merit where it appeared, inter alia, that there

---

[1] The successor to Thomas J. Colbert as the sole executor of the will
of Paul F. Bowser.

had been no occasion for the claimants to assert their claims during the life of the original assignor. [462-463]

In the circumstances, where it appeared that a corporation gave a note for money borrowed, secured by a note and a mortgage to the borrowing corporation by a second corporation endorsed and assigned to the lender and also by a pledge of corporate securities, there was no abuse of discretion on the part of a trial judge many years later, when there was still a substantial balance due on the note given for the money borrowed, in ordering the lender to make demand on the corporations for payment of that note; and the order should be expanded to include also a command to the lender that he, at his expense, institute and diligently prosecute any legal proceedings necessary to obtain payment of such note. [463-466]

PETITIONS filed in the Probate Court for the county of Middlesex on January 16, February 4, and February 5, 1969.

The cases were heard by *Sullivan, J.*

*Robert F. Sylvia* for Elias M. Loew.

*Harold B. Dondis* (*William Harvey* with him) for Patrick J. Hennessey.

*Franklin N. Cunningham* for Harvey B. Leggee.

*Thomas M. White* for Mary E. Sullivan, executrix (*Leo J. Concannon,* for Mary E. O'Neill, with him).

*John F. Dunn,* for Thomas J. Colbert, executor, submitted a brief.

GRANT, J.   At the time of his death on July 17, 1960, Paul F. Bowser was the record owner of various securities representing substantial equity and debt positions in Bay State Harness Horse Racing and Breeding Association, Inc. (Bay State), which owns and operates a racetrack in Foxborough, and a substantial equity position in Norfolk County Concessionaires, Inc. (Norfolk), a corporation supplying food and drink at the track.   Thomas J. Colbert was appointed as the executor of Bowser's will by a decree of the Probate Court for Middlesex County entered on August 18, 1960.   During the period from July 17 through August 8, 1961, fourteen separate petitions for the retention of assets (see G. L. c. 197, § 13)

were filed by or in behalf of various persons who claimed to be the equitable owners of portions of the securities standing in Bowser's name at the time of his death. Those petitions were all promptly allowed, with pertinent orders for retention. On July 23, 1962, one Elias M. Loew, who had held substantial equity and secured debt positions in Bay State and Norfolk since 1947, purchased the interests of all the residuary legatees under Bowser's will. Such purchases were subsequently confirmed by the court on January 14, 1963.

On January 16, 1969, Colbert, as executor, filed a petition on the equity side of the court against all those who had filed petitions for the retention of assets, against Mary E. O'Neill (apparently in her capacity as executrix of the will of James J. O'Neill), and against Loew, seeking declaratory relief with respect to all the claims which had been asserted against the securities of Bay State and Norfolk standing in Bowser's name. Separate petitions, similarly seeking declaratory relief with respect to their particular claims, were filed by four of the claimants. Loew was named or permitted to intervene as a respondent in those four petitions. All five petitions were heard together. The decrees (one of them as amended) entered by the judge determined, among other things, that the securities tabulated in the margin were the property of the claimants therein indicated.[2] Loew has

[2]

| Claimant | Shares of Bay State | Debentures of Bay State | Shares of Norfolk voting trust |
|---|---|---|---|
| Mary E. Sullivan, executrix of the will of Earle D. Sullivan | 500 | | 250 |
| Elias M. Loew | 250 | | 750 |
| Patrick J. Hennessey | 750 | $5,400 | 2,000 |
| Thomas J. Colbert, individually | 500 | | 500 |

appealed from all the decrees.[3]   The judge made no findings or report of material facts.   The evidence, largely documentary, is reported.   The standards of review are those stated in *Colbert* v. *Hennessey,* 351 Mass. 131, 134 (1966), which presented other litigation concerning the Bowser estate.

The present claims to the equity securities in Bay State and Norfolk all spring from written assignments of record interests standing in his name which Bowser made to various of his business associates and acquaintances during the period from December 12, 1947, through May 17, 1948.   Some of the claims are derived directly from assignments originally executed by Bowser, while others rest on subsequent purchases of the interests of the original assignees.   No question has been raised as to the validity of the original assignments as between Bowser and his assignees, or as to the validity of the subsequent purchases from the original assignees.[4]

At the times of the original assignments Bowser's interests in Bay State and Norfolk were represented by shares held by him of record in two separate voting trusts, one of which held all the outstanding stock of Bay State and the other of which held all the outstanding

| Claimant | Shares of Bay State | Debentures of Bay State | Shares of Norfolk voting trust |
|---|---|---|---|
| Mary E. O'Neill, executrix of the will of James J. O'Neill | | $5,400 | 1,250 |
| Harvey B. Leggee | | | 500 |

[3] Bay State and Norfolk, which were named as parties respondent in the separate petitions filed by Sullivan, Colbert (individually) and O'Neill, joined Loew in the claims of appeal filed by him from the decrees entered on those petitions.   As neither corporation has filed a brief in this court, or joined in the brief filed by Loew, the appeals of both will be dismissed for failure to comply with Rule 1:16 (1) of this court.   1 Mass. App. Ct. 891 (1972).

[4] Loew himself falls into the latter category with respect to the securities set opposite his name in note 2.

stock of Norfolk. Bowser's shares in the Bay State voting
trust were, at the times of the assignments, pledged to
Loew as additional security for a first mortgage of the
racetrack property which Bay State had given to Loew
and another [5]; his shares in the Norfolk voting trust were
then pledged to Loew as additional security for a demand
note [6] which Norfolk had given to Loew for further
amounts (subsequently determined to be approximately
$139,000) which Loew had promised to, and which he
subsequently did, pay to various contractors in order to
complete the construction of the track. Accordingly,
each of the original assignments made by Bowser took the
form of an assignment of a certificate for shares in one of
the voting trusts; each identified the particular indebted-
ness for which the assigned shares had been pledged as
collateral; and each contained Bowser's promise to do all
things necessary or required to effect a formal transfer of
the assigned shares on the books of the voting trust or of
the corporation as soon as the pertinent indebtedness
should be satisfied. None of the indebtedness had been
satisfied by the time of Bowser's death, and he had taken
no steps to effect formal transfers of any of the assigned
shares on the books of either voting trust.

The Hennessey and O'Neill claims for debentures of
Bay State (note 2) rest on the testimony of Hennessey that
both he and O'Neill had advanced to Bay State through
Bowser separate sums of $5,400 each which had been
used to purchase portions of the land on which Bay
State's track had subsequently been built, and that the
total of $10,800 so advanced was reflected in a subordi-

[5] The Bay State voting trust was terminated in 1968. Shares in the
trust were exchanged for equal numbers of shares of the stock of Bay
State, and a certificate for all the shares of Bay State which are
referred to in note 2 was subsequently delivered to Colbert in his
capacity as the executor of Bowser's will. The status of the Norfolk
voting trust will be discussed at a later point in this opinion.

[6] This note was also secured by a second mortgage of Bay State's
real estate which was held by Loew.

nated debenture (held by Colbert as executor) for a larger amount (apparently divisible) which Bay State had, with Loew's assent, issued to Bowser as evidence of unsecured amounts advanced to Bay State by and through Bowser. Compare *Hanrihan* v. *Hanrihan,* 342 Mass. 559, 565-566 (1961).[7]

Other facts and evidence will appear in connection with our discussion of the various points argued by Loew in connection with his appeals.

THE RESTRICTIONS ON TRANSFERS OF THE EQUITY SECURITIES
OF BAY STATE AND NORFOLK.

The articles of organization of Bay State and Norfolk both contain provisions (of unchallenged validity) which, unless waived by the directors in a particular instance, require any shareholder, including his heirs, assigns, executors, or administrators, who desires to sell or transfer his shares to offer them first to the corporation by written notice to the directors stating the selling price and naming an arbitrator. If the directors do not, within stated time limits, accept the offer of the shareholder or the price fixed by arbitrators, the holder is free to sell as he wishes. Substantially the same provisions were, by the terms of the Bay State and Norfolk voting trusts, made applicable to the shares of those trusts. Those provisions have not been observed with respect to any of the shares of Bay State or any of the shares of the Norfolk voting trust which are referred to in note 2.[8]

---

[7] Nothing in the evidence required the judge to accept Loew's theory that the amounts in question had been paid by Hennessey and O'Neill in order to acquire the shares in Bay State which were discussed in the *Colbert* case (351 Mass. at 136, 138-142) and which were purchased by Bay State following the decision in that case.

[8] One Frederick Meyer, the assignee from Bowser and the assignor to Hennessey of 500 shares of each of the voting trusts, somehow managed to have the assignments to him reflected on the books of both trusts. However, it does not appear that such entries were known to or authorized by the voting trustees of either trust.

Loew argues that it was error for the judge to order that those shares be delivered by or to Colbert (as executor) to or for the benefit of the persons determined by the decrees to be entitled thereto.[9]

1. We state first our opinion that the directors of Bay State have, by a vote adopted by them on January 18, 1968,[10] waived the restrictions otherwise applicable to the shares in Bay State which are set opposite the names of Sullivan, Hennessey, and Colbert in note 2. We reject the artificial construction of that vote which is contended for by Loew. In our view, the decrees of the Probate Court have effectively and finally determined that each of those claimants is now the "owner" of the shares of Bay State which are here in issue and which are expressly referred to in that vote. Compare *Kentucky Package Store, Inc.* v. *Checani,* 331 Mass. 125, 127, 129 (1954).

2. The shares of the Norfolk voting trust stand on a different footing. Bowser and Loew were the original and only two stockholder signatories to the agreement by which that trust was established and by which the provisions of Norfolk's articles of organization regarding restrictions on the transfer of its stock were, with insubstantial changes, made applicable to the shares of the trust. Accordingly, Loew had a contractual right as against Bowser (or any assignee of his) to require compliance with the restrictions on transfer of shares of

---

[9] Nothing contained in any of the decrees appealed from amounts to an order requiring that any shares be transferred on the books of Bay State or of the Norfolk voting trust. However, the problems have been argued at length in the briefs, and we proceed to deal with them in the hope of avoiding still further litigation.

[10] "In the event it shall be finally determined in the Probate Court of Middlesex County that Thomas J. Colbert, Patrick J. Hennessey, and Mrs. Sullivan, or any of the foregoing persons, is the *owner* of 500 shares, 750 shares, and 500 shares, respectively, of this corporation, then the restrictions on the transfer of Voting Trust Certificates or the common capital stock of this corporation be and the same hereby are waived only to permit such shares to be registered in the name of the aforesaid persons . . . ." (emphasis supplied).

the Norfolk voting trust. Compare *Colbert* v. *Hennessey*, 351 Mass. 131, 138-139 (1966). It appears, however, from the minutes of a meeting of the stockholders of Norfolk held on June 18, 1968,[11] that Loew has unequivocally taken the position that the Norfolk voting trust is no longer in effect. As the appeals of Norfolk are to be dismissed (note 3), Loew's standing to raise any question of compliance with the restrictions on the transfer of the Norfolk stock is only as the present holder of other (and here unrelated) shares of Norfolk[12] and as the residuary legatee (by assignment) of further such shares under Bowser's will. We believe it to be settled law that restrictions on the transfer of stock such as those involved in these cases are intended for the benefit of the corporation and cannot be successfully invoked by a single stockholder acting solely in his capacity as such. See *Blabon* v. *Hay*, 269 Mass. 401, 408-409 (1929); *Samia* v. *Central Oil Co. of Worcester*, 339 Mass. 101, 114 (1959).

However, it does not necessarily follow that Loew will never be in a position to invoke the Norfolk transfer restrictions. It appears from the evidence that he is now the president, a director, and the controlling stockholder of both Bay State and Norfolk. The attitude taken by him to date on the issue of the transferability of the equity securities of both corporations strongly suggests the advisability of further inquiry by the court below (by the taking of additional testimony if necessary) as to whether

---

[11] "Mr. Loew announced that under Paragraph Seventh of the Voting Trust Agreement dated July 29, 1947, the Voting Trust Agreement had terminated on July 28, 1967, all conditions precedent to such termination having been satisfied." The minutes of the meetings of the directors and stockholders of Norfolk held since June 18, 1968, disclose that all concerned have subsequently proceeded on the assumption that the voting trust is no longer in existence.

[12] As each share of the Norfolk voting trust became exchangeable for one share of Norfolk on the termination of that trust, we shall hereafter refer to the equity securities of Norfolk as if they were shares of Norfolk itself.

the directors of Norfolk, acting as a board, will now waive the restrictions on transfer which would otherwise apply to the Norfolk shares identified in note 2.[13]   If they will not, the pertinent decrees should be modified so as to include provisions requiring the present executor of the Bowser will to offer those shares to Norfolk in the manner required by the restrictions on transfer of Norfolk shares.[14]   If, as the result of any such offer, Norfolk should purchase those shares, the executor is to account for the proceeds to the claimants of the shares of the Norfolk voting trust whose names are set out in note 2.

### THE DEBENTURE CLAIMS.

Colbert was appointed as the executor of Bowser's will on August 18, 1960.[15]   On August 8, 1961, Hennessey filed a petition for the retention of $10,800 of the Bay State debentures standing in Bowser's name.   No similar petition was filed in behalf of O'Neill's estate.   Colbert's general petition (as executor) for declaratory relief with respect to all claims was filed on January 16, 1969.   The separate petitions for declaratory relief brought by Hennessey and by O'Neill's executrix, each laying a specific claim to $5,400 of debentures, were filed on February 4 and 5, 1969, respectively.   This history and chronology have prompted two arguments by Loew.

3. The first argument is grounded on the provisions of G. L. c. 197, §§ 13 and 14, and is to the effect that Hennessey's claim for debentures is barred because he

---

[13] Loew seems to have had no difficulty in the past in routinely securing waivers whenever his personal interests or those of members of his family have been involved.

[14] As no price would actually be paid by any of the persons determined to be entitled to those shares, no proposed selling price would have to be stated in any written notice which the executor might give to the directors of Norfolk.

[15] We do not know from this record when Colbert gave bond for the performance of his duties.

brought no petition or other form of action within the one year period referred to in § 14. The argument is untenable. The provisions of §§ 13 and 14, like those of G. L. c. 197, § 9 (the short statute of limitations), are concerned with the claim of one who is a "creditor" of the deceased. It has been consistently held under § 9 and its forbears that one whose suit is brought to enforce an equitable title to specifically identifiable property which has come into the hands of an executor is not a creditor within the meaning of that section. See *New England Trust Co.* v. *Spaulding,* 310 Mass. 424, 430 (1941), and the cases cited therein; *Feeney* v. *Feeney,* 335 Mass. 534, 537-538 (1957). Such is precisely the nature of Hennessey's claim for debentures in these cases.[16] There is no sound basis for distinguishing a claimant under § 13 or § 14 from a claimant under § 9. We conclude, accordingly, that § 14 has no application to the circumstances of these cases.

4. Loew's other argument is that there was no case before the Probate Court which authorized it to award debentures to O'Neill's executrix. The argument appears to be that no petition for retention was filed with respect to the O'Neill claim for debentures within the one year period referred to in G. L. c. 197, § 13. It should be obvious from what has already been said that we are of the opinion that O'Neill's executrix, like Hennessey, was not a creditor of Bowser's estate within the meaning of § 13 and was not obliged to comply with the provisions of that section. The fact of the matter is that Colbert, as executor, did retain in his possession the debenture claimed in part by O'Neill's executrix.[17] The O'Neill

---

[16] As Loew says in his brief, "Hennessey . . . [is] looking not for cash but for debentures."

[17] Colbert had been Bowser's personal counsel for many years and was obviously thoroughly familiar with his affairs as well as with those of both Bay State and Norfolk. See, again, the *Colbert* case, 351 Mass. at 135, 136-137, 143-147. It seems quite likely that

claim was specifically put in issue by the petition filed by Colbert (as executor) on January 16, 1969, and by the petition filed by O'Neill's executrix on February 5, 1969. There was no error in the court's proceeding to determine that claim.

## LACHES.

5. Each of Loew's answers set up, and he continues to argue, a question of laches. The principal thrust of the argument is that he was prejudiced by delay because none of the claimants to the equity securities asserted his claim during the interval between 1947 or 1948, when Bowser executed his original assignments, and 1961, when the petitions for retention of assets were filed. We are not impressed.

Each of the original assignees from Bowser appears to have been a business associate or other acquaintance of his who was specifically advised of the fact that what was being assigned to him was then held by Loew as collateral security for an indebtedness which would not be liquidated in the near future. Each appears to have been content to rely on Bowser's promise, set forth on the face of the assignment, to do all things necessary or required to effect a formal transfer to the assigned shares as soon as the pertinent indebtedness should be satisfied. None of that indebtedness was completely liquidated during Bowser's lifetime. There was nothing whatsoever to suggest that Bowser ever repudiated any of the assignments or gave any of his assignees reason to suspect that he would not receive what had been promised him.[18] In short, there does not appear to have been any reason or occasion for any assignee to assert his claim while Bowser was still alive. During that period Loew's position was no more or greater than that of a simple

Colbert knew and understood, as appears to have been the fact, that the O'Neill claim was intended to be included under the umbrella of the petition filed by Hennessey on August 8, 1961.

[18] To the contrary, there was evidence of instances in which Bowser had passed on to his assignees the dividends which he had received on the underlying securities.

pledgee in possession of collateral; as such he could have had no legitimate concern with whether Bowser or someone else owned the equity in the securities.

None of the claimants in these cases is in any way responsible for the change in Loew's position which occurred when he chose in 1962 to purchase the interests of the residuary legatees under Bowser's will. By that time each of the claims now in dispute was a matter of record in the Probate Court.[19] By that time Loew knew that if he wished to contest those claims, he would have to do so without the benefit of Bowser's testimony. For these reasons it could well have occurred to the court below that Loew had deliberately brought a lawsuit with full knowledge of the possible consequences.

We regard the laches claim as frivolous.

### THE ORDER THAT LOEW DEMAND PAYMENT OF THE LOAN SECURED BY THE PLEDGE OF THE NORFOLK SHARES.

We recite more of the details of the loan secured by the pledge of the Norfolk shares which are in dispute. In August of 1947 Bay State fell seriously in arrears on the payments due to the contractors engaged in the construction of the track in Foxborough. The contractors threatened to stop work, thereby endangering the opening of the track in time for a race meeting scheduled for September. Of all those associated with the venture only Loew appeared to possess the additional funds necessary to effect a resumption of the work. Following conferences among all concerned, the directors of Bay State voted to borrow not in excess of $200,000 from Norfolk, and the directors of Norfolk voted to borrow not in excess of that amount from Loew, who agreed to lend Norfolk up to that amount. Bay State gave Norfolk its demand note for $200,000, secured by what was then a

---

[19] We do not have before us the inventory filed by Colbert as executor. There are indications in the original papers in the *Colbert* case (as to which see *Flynn* v. *Brassard,* 1 Mass. App. Ct. 678, 681 [1974]) that the equity securities now claimed may not even have been listed in the inventory as assets of the estate.

second mortgage on the track. Norfolk gave its demand note (in an amount left blank) to Loew, endorsed over to him the Bay State note, and assigned to him the Bay State mortgage, all as security for its own note. As part of the same set of transactions, Bowser pledged all his shares of the Norfolk voting trust to Loew as additional collateral for the Norfolk note. Loew, with the consent of all concerned, then advanced directly to the contractors the funds (approximately $139,000) necessary to complete the construction of the track.

At the time of the trial of these cases in 1969[20] there was a balance of $100,000 still due Loew on the Norfolk note; Loew continued to hold that note and to hold as collateral therefor the Norfolk shares here in dispute and the aforementioned note and mortgage of Bay State. Audited financial statements of Bay State and Norfolk for the fiscal year ending November 30, 1968, disclose information from which the judge could have found that either corporation had the general financial ability and was in a cash position to liquidate the remaining balance due on the Norfolk note. In addition, the financial statement of Norfolk disclosed approximately $180,000 of loans receivable from Loew and various enterprises in which he was personally and financially interested.

6. The judge, in an order forming a part of the decree entered on Colbert's general petition (as executor), ordered Loew to make demand on Bay State and Norfolk for payment of the Norfolk note. The order ran against Loew as an individual, and not as an officer or director of either corporation; no order was entered against either corporation. Loew argues that the order against him constituted an abuse of discretion and an unwarranted interference in the internal affairs of both corporations.[21]

---

[20] We are not told why the last of the records in these cases was not entered in this court until the end of 1973.

[21] It is not argued (see Lolos v. Berlin, 338 Mass. 10, 13-14 [1958]) that the court lacked the power to enter the order in question or that the order was otherwise erroneous as matter of law.

We perceive no abuse of discretion. Loew, as the holder of the Norfolk note, the pledgee of the Norfolk shares, and the holder of the additional security given by Bay State, had been in a position to demand payment of his money ever since 1947. Loew, as the dominant force in both Bay State and Norfolk, appeared to be in a position to cause either or both corporations to come forward and pay off the Norfolk note. Loew, as the dominant force in Norfolk, had apparently caused that corporation to lend him and his various enterprises substantially more money than was owed him on the note. Loew, although he was the residuary legatee (by assignment) of the Bowser estate, had shown no disposition to expedite the settlement of the estate. The judge could well have concluded that if he took no action to resolve the situation, Loew would continue to hold the disputed shares in captivity until such indefinite time in the future as he might choose to unravel the whole complex of transactions in the manner best suited to his own personal convenience. We have difficulty in understanding how an order designed to break the circle of indifference (if it could or should be called that), to free the disputed shares (or their proceeds) for distribution to those entitled thereto, and to facilitate the winding up of the estate, could constitute an abuse of discretion. To the contrary, the order serves to avoid the circuity of action which would otherwise result if the executor were to be forced to bring separate proceedings against Norfolk to compel it to exonerate the disputed shares by paying off the note. See *Killoren* v. *Hernan,* 303 Mass. 93, 97-98 (1939).

Nor do we see any unwarranted interference in the internal affairs of either corporation. The order does not constitute a usurpation of the functions or discretion of the directors of either corporation. If it gives that appearance, it is only because Loew wears so many hats. If someone else owned the Norfolk note and made demand for its payment, Loew and his fellow directors

would have to face the realities of their obligations and those of their corporations. [22]

7. We think the orders against Loew should be modified in two respects. First, the order requiring him to deliver the certificates for 5,250 shares of the Norfolk voting trust to the executor (subject to the equitable pledge made by Bowser) is to be modified so as not to require the delivery of the certificates until the Norfolk note has been paid in full. Second, the order that Loew make demand on Bay State and Norfolk for payment of the Norfolk note is to be expanded by the inclusion therein of an unequivocal command (see *United States Time Corp.* v. *G. E. M. of Boston, Inc.* 345 Mass. 279, 282 [1963]) that Loew, at his expense, promptly institute and diligently prosecute to their conclusion such legal proceedings as may be necessary to secure payment of the note if it should not be paid within a reasonable time (as determined by the court and stated in the order) following the demands for payment.

8. The appeals of Bay State and Norfolk are dismissed. The pertinent decrees are to be modified in the respects required by part 7 of this opinion and, if necessary, by part 2 of this opinion. They are to be further modified, where necessary, by the substitution (for Colbert) of The First National Bank of Boston as the executor of the Bowser will and by the substitution of the personal representatives of such of the original parties as have died since the commencement of the present proceedings. [23] All the decrees, if and as so modified, are affirmed. Costs of appeal are to be in the discretion of the Probate Court.

*So ordered.*

---

[22] We need not pause to speculate whether Loew's demanding or enforcing payment of the note might embroil him in a minority stockholder's suit. Compare the *Colbert* case, 351 Mass. at 141.

[23] Colbert, Hennessey and, perhaps, others.