CHRISTOPHER F. LINDSEY vs. ALFRED OGDEN, special administrator.

Suffolk. April 22, 1980. — June 30, 1980.

Present: GREANEY, PERRETTA, & KASS, JJ.

*Executor and Administrator,* Suitability, Who may be executor, Collection of assets. *Attorney at Law. Probate Court,* Report of material facts.

A judge of the Probate Court did not abuse his discretion in refusing to remove an attorney appointed as special administrator of an estate and in appointing him as executor of a will naming him as such where there was no evidentiary support for an objector's several contentions that the attorney was hostile to and had taken acts detrimental to the objector, that a conflict would arise if the attorney were permitted to act as special administrator, executor, and trustee under the will, or that the attorney lacked professional competence or was otherwise deficient in character or credibility. [145-155]

PETITIONS filed in the Probate Court for the county of Suffolk on April 14, 1977, and April 7, 1978.

The case was heard by *Yasi,* J.

*M. James Zelman* for Christopher F. Lindsey.

*George M. Moriarty (Francis L. Coolidge* with him) for Alfred Ogden, special administrator.

GREANEY, J. Anne C. Lindsey, a widow, died testate, domiciled in Massachusetts, on January 21, 1977, survived by three children — Christopher Lindsey (Christopher), Leslie Huntoon (Leslie), and Anne Day Brooks (Brooks). Christopher filed objections to the allowance of his mother's will and to the appointment of the named executor. By agreement of all interested parties, Alfred Ogden (Ogden), the New York lawyer who drafted the will and the executor named therein, was appointed and gave bond as special ad-

ministrator (G. L. c. 193, § 10). Christopher subsequently petitioned the Probate Court to remove Ogden as special administrator and to appoint a successor. That issue was tried concurrently with the petition seeking allowance of the will and Ogden's appointment as executor. At the conclusion of the evidence, Christopher waived his objections to the will. The probate judge found that Ogden had not violated his duties as special administrator and that he was suitable and qualified to be appointed as executor. Orders denying the petition for removal, admitting the will to probate, and appointing Ogden as executor followed.

On appeal, Christopher argues that the findings that Ogden was suitable to continue as special administrator and to be appointed as executor are clearly erroneous. Christopher also contends that he was denied access to various documents essential to a fair determination of several issues at the trial by the judge's erroneous ruling that the documents were the privileged "work product" of accountants and a tax lawyer hired by Ogden to assist in his evaluation of the ownership of certain Swiss bank accounts. The case was tried for twelve days; Ogden remained on the stand, mostly for cross-examination, for seven of those days. The judge made a report of material facts under G. L. c. 215, § 11, as appearing in St. 1975, c. 400, § 58. The evidence, running to 1,630 transcript pages with forty-seven exhibits (including the impounded "work product" documents) is before us. In these circumstances, "it is our duty to examine . . . [the evidence] and decide the case according to our own judgment; but the discretion of the judge who heard the evidence and saw the witnesses is entitled to great weight, and his decision will not be disturbed unless we are satisfied that it was clearly erroneous and not supported by the evidence." *Grossman* v. *Grossman*, 343 Mass. 565, 566 (1962), quoting from *Osborne* v. *Craig*, 251 Mass. 169, 172 (1925). See *Foley* v. *Coan*, 272 Mass. 207, 209 (1930); *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. 412, 429-431 (1980).

The record discloses the following facts. The deceased, Anne Lindsey, was married to Kenneth Lindsey, a cofound-

er and director of Textron Company (Textron). Ogden is a
New York attorney[1] whose practice has emphasized a spe-
cialty in the area of estates and trusts. He first met Christo-
pher around 1960; they became social friends and through
Christopher he met all the other members of the family, in-
cluding the deceased. Ogden represented Christopher as
his attorney in several specific matters between the years
1960 and 1972. These included drafting wills for Christo-
pher and his wife, assisting in the refinancing of Chris-
topher's debts with a bank, handling the payment of Christo-
pher's bills from an account funded by his father, selling
Christopher's New York apartment, and arranging a sizeable
loan for Christopher from his parents. During this period
Christopher was also represented by several other attorneys.

Kenneth L. Lindsey died in May, 1969, leaving wills exe-
cuted (and disposing of property) under the laws of the
United States and Great Britain.[2] The major asset of his
estate in this country consisted of Textron stock representing
approximately a ten percent interest in the company. Chris-
topher, a stockbroker at the time of his father's death, retained
Ogden to determine whether he could receive a brokerage
commission for the sale of the Textron stock in the estate, to
ascertain when he could expect a pour over trust created for
his benefit to be funded from the estate, and to estimate the
monetary amount he would receive as a final distribution.
Christopher testified that his confidence in Ogden had erod-
ed by February, 1971, because Ogden had failed to obtain
satisfaction for him on these matters from the executor of his

[1] His background qualifications include: admission in New York for
over forty years; admission before the United States District Court for the
Southern District of New York and the United States Supreme Court;
practice in Washington and New York; bar association activity; and serv-
ice as a trustee or director of several private charitable and educational
organizations, including the Guggenheim Foundation and the Memorial
Hospital Sloan Kettering Cancer Center.

[2] Kenneth had resided in Great Britain during the period of Ogden's ac-
quaintance with the family. His wife maintained residences in Boston
and London; Leslie resided in Massachusetts, Brooks was a domiciliary of
Great Britain, and Christopher resided in Florida.

father's will. In 1971 or 1972, Christopher's sister Leslie engaged Ogden to investigate the possibility of surcharging the executor of her father's estate for failing expeditiously to dispose of the Textron stock in view of a declining market. Christopher was aware of and did not object to this assignment because of its potential benefit to the entire family. Eventually, Ogden reported to Leslie and her mother that an action to surcharge would not be successful, and the matter was not pursued. In 1972, Ogden represented Christopher for the last time by arranging a loan of some $150,000 from Christopher's mother and uncle.

In 1973, Ogden, at the deceased's request, became cotrustee of her revocable inter vivos trust. He also reviewed her estate plan and prepared a new will for her covering all her assets wherever situated.[3] Other than naming Ogden as executor, this new will made no major dispositional changes from the two it superseded and was the one admitted to probate in these proceedings. In 1975, Ogden refused to represent Christopher in further loan negotiations with his mother because of his representation of her. In 1976, at the deceased's request, Ogden redrafted her trust indenture to increase Christopher's interest therein. Following Anne Lindsey's death, Ogden commenced to marshal the assets of her estate in both Great Britain and the United States. In the course of this task, he learned of the existence of Swiss bank accounts in the names of the deceased's daughters and, as will be discussed later in this opinion, took certain steps with regard thereto. On September 14, 1977, he filed his inventory as special administrator.

General Laws c. 193, § 10, empowers a judge of the Probate Court to appoint a special administrator who should be suitable for and remain faithful to his trusts. General Laws c. 192, § 4, requires the Probate Court to issue letters testamentary, once a will has been duly proved and allowed, to

---

[3] This will superseded two wills, one disposing of her property in Great Britain, the other a "global will" dealing with the remainder of her assets in the United States and elsewhere.

the executor named therein "if he is legally competent and a suitable person." Under both statutes "[t]he appointee should be a fitting person having regard to the special conditions of each estate and those interested in it as creditors, legatees, and next of kin. Suitableness is capacity founded on the innate and acquired qualities of the particular person in his relation to the situation of the estate to be administered, and to those directly and indirectly to be affected by the settlement of the estate. Attention may be given to personal characteristics and to all the other causes, not easily susceptible of enumeration, rationally affecting a judicious selection." *Morgan* v. *Morgan,* 267 Mass. 388, 393 (1929), quoting from *Davis, petitioner,* 237 Mass. 47, 49-50 (1921). In passing upon the qualifications of the proposed fiduciary, the probate judge of necessity retains a measure of discretion. However, if it is determined that the person named by the testatrix is suitable, the judge is obliged to appoint him. *Grossman* v. *Grossman,* 343 Mass. at 568. "It should also be borne in mind that the testator is disposing of his own estate, and is entitled to have it administered by the person he selects. Consequently, it requires a pretty strong objection to induce the court to refuse the appointment." 1 Newhall, Settlement of Estates § 46, at 164 (4th ed. 1958).

With these standards in mind, we turn to Christopher's various contentions on the questions of Ogden's performance to date and his suitability, noting, by overview, that most of his complaints are directed at his mother's wishes, not at Ogden's execution of those wishes. First, it is said that the estate plan Ogden prepared for the decedent is detrimental to Christopher's interests. A comparison of the changes in his mother's estate plan between the time Ogden became her counsel and her death reveals that Christopher's life interest in the trust *increased* from a one-sixth to a one-third share (closer to par with his sisters[4]), and that the trus-

---

[4] Under the terms of the deceased's will, intangible personal property and real property were to pour over into the trust. Before Ogden drafted the "restatement" to the trust, it was to pay debts and taxes and then to be

tees received expanded power to invade principal for Christopher's benefit. There is no support in the record for the proposition that the revised instruments resulted in uncontemplated adverse tax consequences to Christopher. The estate plan's substantive and tax provisions were drafted by Ogden in keeping with the decedent's directions and had her informed approval. See *Grossman* v. *Grossman*, 343 Mass. at 569.

Christopher also points to designation in the revised trust of his sisters as cotrustees as evidence that his interests were not served. He asserts that the appointment conflicts with another provision in the trust which prohibits a beneficiary from serving as a trustee and that his sisters, influenced by Ogden, have become hostile toward him. The judge could have found, based on Ogden's testimony and certain of the exhibits, that the deceased was aware of the conflict in the trust's provisions but that because she had not decided on permanent trustees, she directed Ogden to name her daughters for interim service. It is also shown by the evidence that she contemplated additional changes in the trust if certain amendments to the Federal estate and gift tax laws should be passed; that Ogden made clear to her that one of her daughters should not, in any event, be the trustee of her own trust; and that he provided in the instrument for a substitute appointment in the event a named trustee should become ineligible to serve. The instrument was competently drafted and not inimical to Christopher's interests and it is farfetched to suggest that Ogden became unsuitable because he had advised the deceased with respect to amendments of her revocable trust. As to the claimed hostility between Christopher and his sisters, it is manifest that the judge, on conflicting evidence, chose to believe the testimony of Leslie

divided into three equal shares — one share to Leslie outright, one share to be held in trust for Brooks and her children jointly, and one share to be divided into two separate trusts, the first for the benefit of Christopher and the second for the benefit of his children. The revised trust gave Christopher a life interest in the entire one-third share previously divided between him and his children with the remainder to his children.

that she became upset with her brother because of his actions after their mother's death. Other assertions as to perceived "detriment" were not made to the judge below, and as a result will not be considered here. *Drury* v. *Abdallah*, 9 Mass. App. Ct. 865, 866-867 (1980).

Second, it is contended that Ogden is "hostile" to Christopher and that he used confidential information obtained in the course of representing Christopher to undermine his relationship with his mother. Based on the fact that Christopher's relationship with his mother was distant (he saw her only twice in fifteen years), the judge could have concluded that it was Christopher, not Ogden, who had created whatever estrangement existed between mother and son. Apart from this, any disclosure of Christopher's financial status appears to have been sanctioned by him, without any breach of duty on Ogden's part, in order to obtain the 1972 loan from his mother and uncle. The other incidents claimed as showing hostility are of minor moment. Even if the judge accepted them as indicating the existence of some tension between the men, it was obviously considered to have little bearing on the issue of suitability. *Cefalo* v. *Cefalo*, 359 Mass. 756, 757 (1971).

Third, Christopher argues another "conflict" in that Ogden "switched sides" and prepared his mother's estate plan, supposedly utilizing confidential information gained from Christopher to do so. "The mere fact that the . . . beneficiary and [the testatrix] . . . may have had the same counsel disqualified no one, and made no one unsuitable for any purpose here material. Interests do not necessarily conflict because parties have counsel in common." *Home Natl. Bank, petitioner*, 341 Mass. 286, 291 (1960). By incisive questioning of Ogden, the judge assured himself that Christopher had never objected to Ogden's representation of other family members despite knowledge of such representation. The judge could have found as well that when Ogden became the deceased's lawyer and trustee, all prior representation of Christopher ceased, and that any disclosure of Christopher's finances which his mother used in considering

her testamentary plan was obtained with Christopher's full consent during the loan negotiations. The record is barren of any other disclosure by Ogden to the deceased that smacks of a breach of the lawyer-client privilege. The judge properly rejected the balance of Christopher's unsupported assertions as speculative.

Nor is there any merit to the contention that a conflict will necessarily occur if Ogden accounts to himself in the three capacities of special administrator, executor, and trustee. As special administrator and executor Ogden has a statutory duty to account to the court.[5] G. L. c. 206, § 1. Any future problem can be remedied by the extensive authority possessed by the court to monitor a fiduciary's activities. See *Ammidown* v. *Kinsey*, 144 Mass. 587 (1887). Nor does a conflict arise solely because Ogden is both a trustee under the revised indenture and executor under the will. It is quite common and permissible for a testator to name the same person as executor and testamentary trustee in order to facilitate handling of the estate. The assertion also overlooks the fact that a disinterested cotrustee from a trust company now serves with Ogden, and it ignores the court's ample authority to remedy any problems that might arise. Otherwise, it is clear that "the resulting complexity of appointing [Ogden] as executor [was] 'one of which the [testatrix] was not unaware and it can be said that [she] contemplated it and created it.'" *Colbert* v. *Hennessey*, 351 Mass. 131, 147 (1966), quoting from *Matter of Sherman*, 9 Misc. 2d 731, 735 (Surr. Ct. 1951), aff'd, 279 App. Div. 981 (N.Y. 1952).

Fourth, the assertion that Ogden was engaged in the unauthorized practice of law in Massachusetts is frivolous. Og-

---

[5] We do not view clause eight of the will, which authorizes the executor "to take such time for the liquidation of my estate . . . without regard to the provisions of any statute . . . relating to the time for accounting by executors" as relieving Ogden of his duty to account. The clause has the salutary purpose of advising the executor to proceed in a cautious and prudent way in managing this complicated estate, but his performance will remain subject to periodic scrutiny by the Probate Court. Contrast *Briggs* v. *Crowley*, 352 Mass. 194, 200 (1967).

den never held himself out as a Massachusetts lawyer, never drew any documents in Massachusetts, and never did anything else that could be considered as the practice of law in this State. A Massachusetts domiciliary is free to consult a licensed New York attorney on the merits of her estate plan. Cf. *Brooks* v. *Volunteer Harbor No. 4, Am. Assoc. of Masters, Mates & Pilots*, 233 Mass. 168, 170 (1919); *Opinion of the Justices*, 289 Mass. 607 (1934). Ogden's overseeing the execution of the will in Boston is not unauthorized practice (see G. L. c. 191, §§ 1 & 2, as amended by St. 1976, c. 515, §§ 3 & 5), and there is nothing to the argument that a New York lawyer is unsuitable to serve as the executor of a Massachusetts will because he is not licensed to practice in the Commonwealth. *Atherton* v. *Fitz Gibbon*, 346 Mass. 384, 387 (1963). The several other contentions that the instruments were unskillfully drafted and negligently handled need not be discussed; the documents reveal competent craftmanship by a lawyer versed in the probate field and the evidence supports the judge's rejection of each argument.

Fifth, Ogden's handling of a particular matter for a corporation involved in mining operations in Chile is cited as evidence of a "deficiency in character and credibility." In 1970, as general counsel for the corporation, Ogden was approached by its president and informed that the corporation, on advice from its branch office in Santiago, had decided to make a substantial contribution to the political campaign of an opponent to Salvador Allende for the presidency of Chile. The corporation desired the contribution be shrouded, because of concern that the company's mine would be nationalized if Allende were elected. An associate in Ogden's office determined that the contribution was then legal under our law. Upon receiving that advice (which is not questioned as improper in this case), the corporation's check for $60,000 was deposited in a special client's escrow account maintained by the law firm. A few days later, the funds were withdrawn and credited to an account not connected with the law firm in another bank. Ogden testified that he had no knowledge concerning the corporation's

treatment of the transaction on its books (it listed the money as payment of legal fees), and that he was certain his law firm had never billed $60,000 to the corporation for services. In 1975, Ogden voluntarily appeared before the Securities and Exchange Commission (SEC) which was investigating possible violations of the securities law by the corporation. With his client's permission he gave extensive testimony before the commission and disclaimed any knowledge of sinister overtones to the contribution.[6]  Christopher testified that Ogden had told him in a telephone conversation that a "question of bribes" was involved and that "we do it all the time."  Following this testimony, the judge recalled Ogden and determined that he had never been cited for improper conduct by any agency of the United States or Chilean governments, or by any bar association.

Ogden was not required to rebut Christopher's account of the telephone call; it is obvious that the judge disbelieved Christopher's testimony.  There is no evidence in the transcript of the hearing before the SEC that Ogden directly or indirectly violated any law, or that he acted as a conduit for a political bribe.  The judge determined that Ogden's role in the transaction did not demonstrate his present unsuitability to serve as executor.[7]  We cannot say that an abuse of discretion has been shown as to the judge's finding on the point.

Sixth, we reach the matter of the Swiss bank accounts.  In the course of marshaling the assets of the estate as special administrator, Ogden questioned the deceased's children about the existence of assets known to them.  In September,

---

[6] The judge received the transcript of Ogden's testimony before the SEC de bene.  Counsel for Ogden objects to the transcript's inclusion among the exhibits on appeal on the basis that its relevancy was never shown. The judge, at the conclusion of the trial, stated that "I'm not aware that [the transcript] is in."  However, a motion was not made to strike the transcript, and it is clear from the record that the judge familiarized himself with its contents.  We consider it a proper part of the record in the case.

[7] When the contribution was made the Federal Foreign Corrupt Practices Act of 1977 had not been enacted (see now 15 U.S.C. §§ 78a, 78m[b] [2]-[3], 78dd-1 to 2, 78ff [Supp. I 1977]).

1977, Leslie informed him that she and her sister held certain accounts in a Swiss bank, as the result of gifts made by their mother in 1969 and 1972.[8] Ogden immediately obtained authorization from both daughters to go to Switzerland and speak directly with employees of the bank. He did this accompanied by counsel for the two daughters, in whose names the accounts then stood. He obtained from the Swiss bank a history of the accounts, including the dates of transfer, and all of the documentation which the bank retained. He interviewed both daughters to determine whether gifts had been completed. He then consulted one of his tax partners who in turn retained an accounting firm to check computations with respect to the value of the accounts and the dates of the gifts. He informed counsel for Kenneth Lindsey's executor, who disclaimed all knowledge of the accounts. He reviewed the files of the deceased's previous counsel, talked to her English solicitors, and reviewed all of his own correspondence with Anne Lindsey to reconfirm that she had never claimed ownership of any Swiss accounts. On the basis of these investigations, he concluded that the deceased had made completed gifts of the accounts in 1969 and 1972, and that they were not properly includible in her estate. See *Meagher* v. *Kimball*, 220 Mass. 32, 34 (1914). He did not seek instructions from the court to confirm this conclusion. He also discovered that neither gift nor income taxes had been paid on the accounts during the deceased's lifetime. In his capacity as trustee, Ogden considered potential trust liabilities for these taxes, including interest and penalties. He prepared and filed returns with the Internal Revenue Service and the Commonwealth, disclosing the facts and tolling the accumulation of interest and penalties. Christopher first learned of the accounts in the course of taking Ogden's deposition in January, 1978.

---

[8] Ogden's initial inventory as special administrator was due a few days after he learned of the accounts and before he had an opportunity to investigate them. As a result, he footnoted his inventory with the statement "search for additional assets is continuing."

Christopher's objections to Ogden's handling of the accounts (as bearing on suitability) rest on the assertion that he should have been told about them earlier so that he "could have instituted litigation to protect his [mother's estate] and to determine ownership of the accounts." The implication is that Ogden made a decision which cannot now be challenged and which is adverse to the interests of the estate. Ogden had complete authority, and the concurrent obligation, as special administrator to investigate the status of the accounts. See *McGrath* v. *C.T. Sherer Co.*, 291 Mass. 35, 60-61 (1935); G. L. c. 193, §§ 10 & 11. As trustee he was also under a continuing duty to conserve the assets of the trust. At the trial, the matter of the accounts was fully ventilated. The judge satisfied himself that no purposeful concealment had taken place and that the investigation into the ownership of the accounts had been properly conducted. A special administrator has the discretion, after satisfying himself that certain property such as a bank account is not part of the estate, to decline to spend the estate's assets on proceedings designed to try the question of title. There was disclosure of the accounts' existence to the executor of Kenneth Lindsey's estate, and there is no suggestion that the executor of that estate is not able to protect its interests in an efficient and economical fashion. Even assuming that earlier disclosure to Christopher might have been called for, there has been no showing that Christopher's right to challenge ownership of the accounts has been foreclosed, either by way of separate proceedings now or by a future challenge to Ogden's accounting as special administrator.

Seventh, associated with the previous claim is the question of "work product." At several points in the trial, Christopher's counsel sought access to the bank documents and the notations of the accountants and the tax attorney made thereon and their respective worksheets, on the basis that they constituted evidence to show that Ogden had purposely concealed the existence of the accounts and to establish that the accounts were not gifts. There is confusion in the

record as to what Christopher actually wanted. He first sought the original Swiss bank documents and worksheets, but later appeared to state that he would be satisfied with copies of the originals from which the notations were excised, plus a summary of the professionals' tax analysis which Ogden used in testifying and as to which any privilege was waived. After he received copies of the documents and the tax analysis, he renewed his motion for the originals with the notations, apparently on the basis that as a one-third beneficiary of the trust, he was entitled to see work product paid for by the trust. At the same time he appears to have conceded that the notations and worksheets were in fact work product. See *Hickman* v. *Taylor*, 329 U.S. 495, 510-512 (1947); *United States* v. *Nobles*, 422 U.S. 225, 236-239 (1975). The judge at one point ruled that the materials sought were privileged, then reopened the issue by inviting Christopher's counsel "to show . . . by argument, how this court can order an adversary to provide you with the work products of these experts?" A further showing was not made. At the end of the trial, the judge ordered the records impounded.

There was no error in the disposition of this question. Christopher's counsel had copies of all of the original bank documents which Ogden had received from the Swiss bank, from which he was presumably as capable as Ogden of gleaning information as to the history of these accounts or any other relevant material contained therein. To the extent that the utilization of such information required the explanation and assistance of experts in the tax and accounting fields in preparation for trial, he could have hired his own experts and is not entitled to use the discovery process to avoid this burden. Cf. Mass.R.Civ.P. 26(b) (3) and (4), 365 Mass. 773-775 (1974); Smith & Zobel, Rules Practice § 26.6, at 215 (1975). There is no indication in the record that any of the notations had been made by Ogden; nor was a showing made to the court of either the relevance of these materials (as distinguished from the bank records themselves) to counsel's claimed reasons for seeking them or Christopher's

inability to gather substantially equivalent information elsewhere. See *Hickman* v. *Taylor, supra* at 512. See also *United States* v. *Nobles, supra* at 238-239. Moreover, by the end of the trial, Christopher's counsel indicated to the court that he was satisfied with what had been produced and that he simply wished the original records "impounded." We take these actions together as indicating basic satisfaction with the judge's resolution of the issue. We decline to consider new arguments on the question which were not voiced in the trial court. See and compare *John B. Deary, Inc.* v. *Crane,* 4 Mass. App. Ct. 719, 724 (1976); *Paris Paper Box Co.* v. *Boston,* 7 Mass. App. Ct. 902, 903 (1979).

Eighth, and final, is the contention that because the report of material facts contains several errors, the final result is flawed. Some of the errors (for example, a one-year mistake in the deceased's date of death) are plainly of the scrivener variety; others are more substantive (for example, the statement that Ogden filed gift tax returns on behalf of the *estate* rather than the trust). A judge preparing findings of fact should strive to make the findings clear, complete and accurate. In view of the substantive errors, we have been especially careful to assure ourselves that all of the factual findings essential to the critical legal questions are supported by the evidence or that they rest on credibility assessments which we will not disturb. We conclude that they are so based and that the judge's ultimate determinations that Ogden had not violated his duties as special administrator or trustee and that he is a suitable person to be appointed as executor are sound.

*Decree affirmed.*