In the Matter of the Application of Janet L. **BLAKEMAN** as Executor of the Estate of Louis F. Lauck, Deceased, to Compel Delivery of Property of said Estate in the Possession of William Conroy.

No. CV 81–0796.

United States District Court,
E. D. New York.

July 20, 1981.

Durben & Haskel, Garden City, N. Y. (Jules J. Haskel, Garden City, N. Y., Armand A. Korzenik, Hartford, Conn., of counsel), for Edwin Gruner.

Patterson, Belknap, Webb & Tyler, New York City (Thomas C. Morrison, Christopher C. Angell, Laughlin M. Barker, New York City, of counsel), for Janet Blakeman.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

This case was the subject of the court's memorandum and order dated April 22, 1981, denying a motion of Edwin Gruner to dismiss or stay the action. Familiarity with that opinion is assumed.

Gruner owns 21.5 shares or about 18% of the stock of Litchfield Fabrics, Inc. ("the corporation"). He has claimed a right to buy all of the stock held by Louis Lauck at the time of his death, namely, 85.5 shares or 71.85%. His will allocated this stock to his three daughters' shares of the estate. Janet L. Blakeman, Lauck's daughter and executrix of his estate, asks the court for a declaration that Gruner has no right to purchase the stock and for a dismissal of his claim.

Gruner says his right stems from two sources: (1) a May 9, 1966 agreement between the corporation's then four stockholders of which Gruner was not one, and (2) a by-law provision endorsed on the shares. The issues are governed by Connecticut law.

I

In 1966 Lauck bought into the corporation, and on May 9, 1966 an agreement was executed by the then four equal stockholders, whom the agreement described as "Louis Kaplan, Murray S. Kaplan, Louis F. Lauck and Joseph Versari (hereinafter called 'Stockholders')." The agreement provides, among other things, that a Stockholder wishing to sell his stock will notify the corporation and the other Stockholders, that the corporation will have the first option to buy the stock at book value as determined by the last quarterly audit, and that, if the corporation does not exercise the option, "the remaining Stockholders" will have the option to purchase the stock "in equal shares" or "in such proportion as the remaining Stockholders may agree upon."

The agreement also provides that in the event of the death of a Stockholder the corporation will have first option to purchase at book value, and if the corporation declines "the surviving Stockholder" (sic) will have the option, the shares to be purchased "in equal shares by each of the remaining Stockholders" or in such proportion as they agree upon.

The agreement also recites that the parties have full knowledge of the restrictions placed on their stock by Article VI, Section 7 of the corporate by-laws and relinquish any rights to repurchase under those provisions as long as the agreement is in effect. The agreement provides for its termination upon the "written consent of the parties hereto" or on dissolution or bankruptcy.

In 1958, long before the Kaplans or Lauck were interested in the corporation, Versari, who ran the business, hired Gruner, who had emigrated from Germany, as a mechanic. In 1959, he became plant superintendent. In February 1967 Versari sold 19½ of his shares to Gruner for $7,747. No formal waiver or consent was executed by the three other Stockholders, but apparently the matter was approved by the board of directors. Gruner did not sign the 1966 agreement or any other document reciting that he was a party to that agreement. Nor did Lauck, the Kaplans, or Versari

execute any agreement recognizing that Gruner was a party to the 1966 agreement.

In the summer of 1967 Versari died, and on August 8, 1967 Lauck became president of the corporation, while Gruner was appointed general manager. From that time on Lauck and Gruner developed a close business and personal relationship.

In March of 1968 the corporation redeemed Versari's 72 shares. In October 1969 Louis Kaplan bought all the shares of Murray S. Kaplan, and the corporation redeemed 97½ shares owned by Louis Kaplan. In connection with the transaction between the Kaplans the attorney for Louis Kaplan prepared an agreement reciting that the 1966 agreement placed restrictions on Murray Kaplan's shares, that the undersigned and the corporation "do hereby waive the provisions of said agreement only insofar as they relate" to the sale by Murray Kaplan to Louis Kaplan, and that the "undersigned further acknowledge that the aforesaid agreement dated May 9, 1966 shall, except to the extent herein waived, remain effective." Lauck, Louis Kaplan and Gruner signed in the places provided for their signatures.

In March 1972 the corporation redeemed all of Louis Kaplan's then owned 97½ shares. This left only two stockholders, Lauck with approximately 82% of the stock and Gruner with approximately 18%. Gruner owned 21.5 shares, the corporation having issued to him in 1970 two shares as compensation.

Some time in the summer or early fall of 1972 it came to the attention of Blakeman, a lawyer who had acted in some matters as attorney for her father and the corporation, that the 1966 agreement did not include Gruner. On October 5, 1972 she wrote to Gruner stating that the agreement "does not include you" and that since all parties to it other than Lauck "no longer have any interest in the corporation, it seems advisable that a new agreement be prepared and that the original agreement dated May 9, 1966 be formally terminated." The letter concluded: "Accordingly, I shall appreciate your consenting to the termination of the agreement and preparation of a new agreement to be submitted to you for your approval. Your consent can be indicated by signing the copy of this letter and returning it to me." At the bottom of the letter was a line for Gruner's signature under the words "I consent to the above."

By mistake Gruner sent a copy back without his signature, and on November 21, 1972 Blakeman wrote him again stating that she had received back her previous letter "without any indication as to whether or not you consent to the preparation of a new stockholders agreement," and asking him, if he did consent, so to indicate by signing. Gruner then signed and returned the letter.

Some time in 1973, certainly by mid-September, Gruner became concerned on hearing rumors that Lauck was seeking to sell the business. Gruner was afraid he would be left as a minority stockholder in the event of such a sale and wished to be assured that his own minority interest would be bought out at the same time. He talked to Lauck about this and was referred to Blakeman.

Gruner then called Blakeman, made clear his concern and desire, and followed the call with a letter to Blakeman confirming her statement that she would give "the agreement" her attention and that he "could expect to receive a copy within the next couple of weeks."

On October 25, 1973 Blakeman sent her father a draft of an agreement providing, among other things, that Lauck would not make any agreement for the sale of his stock "without providing for the inclusion in such agreement of the sale of all" of Gruner's stock. The draft also provided that on the death of Gruner the corporation would have the option to buy his stock. No provision was made for an option to Gruner to purchase Lauck's stock. Indeed, it never occurred to Gruner that he would be in a position to make such a purchase.

Lauck delivered the draft to Gruner, who then sought advice of counsel, and David J. Frauenhofer, a Connecticut attorney, had

further dealings with Blakeman. Their discussions were exclusively as to the price at which Gruner's stock would be sold in the event of a sale by Lauck. At no time did Frauenhofer hint that Gruner had rights under the 1966 agreement or seek to obtain an agreement giving Gruner an option as to Lauck's shares.

On January 17, 1974 Blakeman wrote Frauenhofer that the matter could be resolved by stating that the sale of Gruner's stock "shall be for an amount not less than book value." On February 22, 1974 Frauenhofer wrote back that Gruner and he "would like to pursue the possibility of pegging the sale price of his stock to a percentage or ratio that would be in proportion to the unit price your father would receive upon the sale of his stock." On May 6, 1974 Frauenhofer wrote Blakeman that Gruner had informed him that Gruner "would be amenable to an agreement containg (sic) a clause that the price your father receives per share would be equal to the price per share that Eddy (Gruner) receives for his block of stock."

Finally on September 12, 1974 Lauck wrote to Gruner that he would not agree to sell without providing in the agreement for the sale of Gruner's stock "at the same time and on the same terms." Gruner took this letter to Frauenhofer, who never again communicated with Blakeman. Gruner never expressed any dissatisfaction with the outcome.

In November of 1976 Lauck made gifts of four shares each to his three daughters. Gruner knew of these gifts no later than October 12, 1977. On that date all of the officers and directors of the corporation signed a waiver of a meeting of directors and stockholders and a consent to the adoption of a resolution changing the name of the corporation. That document, at least three copies of which Gruner signed, showed the names of all three of Lauck's daughters as stockholders.

## II

■ The 1966 agreement does not give Gruner, who was not a party, a right to purchase the shares owned by Lauck. It provides for an option to a "Stockholder" to purchase the shares of another "Stockholder" on his death and recites at its outset that the four named parties were to be "hereinafter called 'Stockholders'." The purpose to grant an option only to these four is made plain by the provision that in the event the option is exercised the shares "may be purchased in equal shares by each of the remaining Stockholders" or in such proportion as they agree. This language shows that the parties contemplated that only the original four parties would have option rights. The four hardly would have provided to a later stockholder holding, say, 1% an option to buy an "equal" share.

■ The last paragraph of the agreement provides that it "shall bind not only the parties hereto, but also their heirs, executors, administrators and assigns." Possibly these words could be construed to "bind" Gruner to the extent of subjecting his stock to an option. But the fact that an assignee is bound to offer his stock before selling cannot fairly be interpreted to show an intent that a subsequent holder of a partial share may have an "equal" option with the other three parties to the agreement.

■ The October 1969 document prepared by Louis Kaplan's lawyer does not serve to make Gruner a party to the 1966 agreement. That document, though signed by Gruner, simply waives the provisions of the 1966 agreement as they applied to the sale between the Kaplans and recites that that agreement otherwise remains effective. The document does not purport to give Gruner any rights which he did not possess under the 1966 agreement. Nor should the excess of caution of a lawyer for someone other than Lauck be read by implication retroactively to make Gruner a party to that agreement.

■ In any event it is plain that Gruner consented to the termination of the agreement. He signed the October 5, 1972 letter from Blakeman and expressly gave his consent. Gruner would have the court construe the consent as contingent on the exe-

cution of a new agreement acceptable to him. But that is not a fair reading of what Gruner signed. Blakeman's letter does not say that she will prepare a new agreement which will terminate the old. She asked for consent "to the termination *and* preparation of a new agreement" (emphasis supplied). By signing Gruner consented to both. There is no basis for Gruner's assertion that Blakeman defrauded him.

### III

■ Since the 1966 agreement is not in force the court must consider Article VI, Section 7 of the corporation's by-laws, which provides:

> No stock shall be transferred to any person not a stockholder of the corporation unless such stock shall first be offered to the other stockholders of the corporation for purchase within sixty days of such offer at a price representing the book value of such stock as shown on report of the financial status of the corporation compiled as of the first day of the month during which said offer shall have been made.

Gruner contends that this provision applies to Lauck's bequest in his will of the shares to his three daughters and that he has a right to buy those shares at book value. The argument is that Lauck's gifts to his three daughters in 1976 were made without Gruner's consent, that he may now require the recission of those gifts, that upon recission none of the daughters will be "a stockholder" and that thus the shares bequeathed to them are subject to Gruner's option before they are "transferred" by the executrix into their names.

While the parties agree that there is no Connecticut decision in point, in most other jurisdictions where the question has been raised the courts have held that similar provisions do not apply to dispositions as a result of death. In *Globe Slicing Machine v. Hasner*, 333 F.2d 413 (2d Cir. 1964), *cert. denied*, 379 U.S. 969, 85 S.Ct. 666, 13 L.Ed.2d 562 (1965), the court held that under New York law a by-law restriction against a "sale or disposition" of shares

without giving an option did not apply to a transfer by an executor to the decedent's beneficiary. The court held that such first option provisions "in order effectively to restrain dispositions by will must specifically so provide." *Id.* at 415. *See also Storer v. Ripley*, 12 Misc.2d 662, 664, 178 N.Y.S.2d 7, 10 (Sup.Ct.N.Y.Cty.1958) (if such a restriction is to be effective as to a transfer consequent on death "that consequence must be clearly expressed"); *Lane v. Albertson*, 78 App.Div. 607, 79 N.Y.S. 947 (2d Dep't 1903) (articles of joint stock association restricting a sale or "transfer" do not apply to transfer to executor or subsequent transfer to residuary legatee).

Cases in six other jurisdictions have taken a similar view. *See In Re Estate of Martin*, 15 Ariz.App. 569, 490 P.2d 14 (1971), *pet. denied*, 108 Ariz. 536, 502 P.2d 1355 (1972); *Matter of Estate of Riggs*, 36 Colo. App. 302, 540 P.2d 361 (1975); *Stern v. Stern*, 146 F.2d 870 (D.C.Cir.1945); *Vogel v. Melish*, 31 Ill.2d 620, 203 N.E.2d 411 (1964); *Elson v. Security State Bank of Allerton*, 246 Iowa 601, 67 N.W.2d 525 (1954); *Taylor's Admr. v. Taylor*, 301 S.W.2d 579 (Ky. 1957). Only Massachusetts has reached a different conclusion. *Colbert v. Hennessey*, 351 Mass. 131, 217 N.E.2d 914 (1966); *Boston Safe Deposit and Trust Co. v. North Attleborough Chapter of the American Red Cross*, 330 Mass. 114, 111 N.E.2d 447 (1953).

Gruner's Connecticut counsel conceded that he knew of no Connecticut policy justifying the harsh result for which he argued. Obviously in many instances the book value of corporate stock will be far below true value, particularly in a small, closely held corporation. Indeed, Blakeman contends that such is the case here. If the law is to frustrate a testator's desire to leave to his beneficiaries his entire interest in a corporation, it seems only reasonable to require specific language to that effect. That is the principle followed in all but one jurisdiction dealing with the question.

Gruner's counsel suggests that Connecticut, reading the by-law provision with the utmost literalism, would decide differently and cites *Collins II v. Sears, Roebuck and*

*Co.*, 164 Conn. 369, 321 A.2d 444 (1973). That case involved construction of a provision in a lease obligating the tenant—Sears, Roebuck and Company—to pay additional rent in the event foreclosure proceedings were instituted by the landlord's mortgagee against the premises. The provision did not provide for the termination of additional rent when foreclosure proceedings were withdrawn. Sears, Roebuck and Company argued that the failure to include this contingency rendered the entire provision void for ambiguity and vagueness. The proof showed that the lease was prepared by Sears, Roebuck's counsel and that the language in question was inserted at the direction of Sears, Roebuck. Under the circumstances the court held that Sears, Roebuck was bound by the language it supplied.

This holding is hardly persuasive that Connecticut in interpreting the by-law restrictions on transfer of stock would reject the majority rule. Indeed, the Supreme Court of Errors of Connecticut has held that "if the terms of an instrument are fairly susceptible of two or more interpretations, the one which is the more equitable, reasonable and rational is to be preferred." *Texaco, Inc. v. Rogow*, 150 Conn. 401, 190 A.2d 48, 52 (1963) and cases cited. *See also Lanna v. Greene*, 399 A.2d 837, 175 Conn. 453 (1978).

The majority rule is certainly reasonable and rational, and the court is persuaded that Connecticut would follow it. The by-law provision does not apply to Lauck's testamentary dispositions.

In any event, it is clear that Gruner waived any by-law rights to object to the 1976 gifts to Lauck's daughters. He knew about the gifts at least by October 12, 1977 when he signed the consent to the resolution for the change of name of the corporation. He made no objection and is estopped from making one now after Lauck relied on his acquiescence. The three Lauck daughters are thus properly "stockholders" of the corporation, and even if read to apply to a testamentary disposition the by-law provision does not apply to a transfer to a "stockholder."

## IV

The court declares that Edwin Gruner does not have a right to purchase the Lauck estate's stock in Litchfield Fabrics, Inc., and dismisses the claim of Gruner against the estate.

The foregoing constitutes the findings of fact and conclusions of law of the court.

So ordered.